**ORIGINAL**

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAY 2 1 2004

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| RONALD S. LEVENTHAL, Derivatively on behalf of Post Properties, Inc. and Representatively on behalf of all other similarly situated shareholders of Post Properties, Inc., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT C. GODDARD III, as an Individual and as Chairman of the Board of Post Properties, Inc.; and DAVID P. STOCKERT, SHERRY W. COHEN, JOHN T. GLOVER, CHRISTOPHER J. PAPA, THOMAS D. SENKBEIL, and THOMAS L. WILKES, in their Individual capacities, <br><br> Defendants, <br><br> and POST PROPERTIES, INC., a Georgia Corporation, <br><br> Indispensable Party and Nominal Defendant. | Civil Action File No. <br><br> **1 04-CV 1445** **JTC** |

## NOTICE OF REMOVAL



Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendants Post Properties, Inc. ("Post Properties"), Robert C. Goddard III, David P. Stockert, Sherry W. Cohen, John T. Glover, Christopher J. Papa, Thomas D. Senkbeil, and Thomas L. Wilkes (collectively "Defendants"), hereby remove the above-captioned action from the Superior Court of Fulton County, State of Georgia, to the United States District Court for the Northern District of Georgia, Atlanta Division.[1]

## BASIS FOR REMOVAL

1.

A case may be removed from the state court in which it was filed to a federal court in the district in which the state court sits where the federal court has original jurisdiction over the claims in the Complaint and the Notice of Removal is timely. 28 U.S.C. § 1441.

2.

As more fully set forth below, this Court has original jurisdiction over Plaintiff's action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

---

[1]    Each of the Defendants reserves all rights, including all defenses and objections, and the filing of this notice of removal is subject to, and without waiver of, all such defenses and objections.

Further, this Notice of Removal is timely.[2]   Therefore, this action is removable pursuant to 28 U.S.C. §§ 1441.

## BASIS FOR FEDERAL QUESTION JURISDICTION

### 3.

Federal question jurisdiction exists pursuant to 28 U.S.C. § 1331 where a plaintiff's allegations present a substantial, disputed question of federal law. *Ayres v. General Motors Corp.*, 234 F.3d 514, 518 (11th Cir. 2000).

### 4.

Plaintiff's allegations assert violations of certain federal laws, including, but not limited to, the federal securities laws.  These allegations raise substantial, disputed questions of federal law, including, among others, questions arising under the federal securities laws.  As such, this Court has jurisdiction, and the case is removable.

---

[2]    This action was filed on May 13, 2004.  Defendants have received a courtesy copy of the Complaint, but have not been formally served with process.  On May 19, 2004, Defendants wrote Plaintiff offering to waive and acknowledge service provided Plaintiff supplies the waiver and acknowledgement forms, but Plaintiff has not yet done so.  As such, service has yet to be formally effected or waived.

5.

For example, Plaintiff's fraud claim (Count XIV) is predicated upon alleged violations of the Sarbanes-Oxley Act of 2002 and other federal securities laws, including certain reporting requirements for publicly-traded companies. Compl. ¶¶ 198-99; *see also id.* ¶¶ 210-11, 6 ¶ D.

6.

Likewise, Plaintiff's "Proxy Fraud" claim (Count VII), upon which Plaintiffs' prayer for injunctive relief is predicated, requires analysis of Defendants' federal reporting obligations under Rule 14a-9 of the Securities Exchange Act of 1934, *see* Compl. at 83-85, the significance of which Plaintiff concedes in the Complaint. *See id.* at 9 ¶ R (citing Rule 14a-8).

7.

Plaintiff's claims also rely upon allegations that Defendants utilized, *inter alia*, interstate wire and telephonic communications and the United States Mail to effectuate their allegedly fraudulent misconduct. *See, e.g.*, Compl. ¶¶ 197, 209; *see also id.* at 12 ¶ Z, 15 ¶ 18.

8.

Finally, Plaintiff concedes that "violations of federal laws are asserted [in the Complaint] as the basis for state law sought [*sic*] relief . . . ." Compl. ¶ 20.

Therefore, because the action is premised on violations of federal law, questions of federal law are presented, and the action is removable to this Court.

## CONCLUSION

9.

Pursuant to 28 U.S.C. §§ 1441 and 1446, therefore, removal of the above-captioned state court action to this Court is appropriate.

10.

All of the Defendants have consented to and join in this Notice of Removal.

11.

A true and correct copy of the docket sheet in the Fulton County action and true and correct copies of all process, pleadings, orders and documents provided to the removing Defendants to date are attached hereto at Tab 1.

12.

Pursuant to 28 U.S.C. § 1446(d), this Notice of Removal is being served on Plaintiff and filed with the Clerk of the Superior Court of Fulton County.

13.

Defendants reserve the right to amend or supplement this Notice of Removal.

WHEREFORE, because this Court may exercise federal subject matter jurisdiction over Plaintiff's action pursuant to 28 U.S.C. § 1331, removal is appropriate under 28 U.S.C. § 1441.

This 21st day of May, 2004.

KING & SPALDING LLP

_B. Warren Pope_

M. Robert Thornton
Georgia Bar No. 710475
B. Warren Pope
Georgia Bar No. 583723

191 Peachtree Street, N.E.                Counsel for Defendants
Atlanta, GA 30303-1763
404-572-4600

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served a true and correct copy of the foregoing **NOTICE OF REMOVAL** by depositing a copy thereof, postage prepaid, in the United States Mail, properly addressed upon:

> Ronald S. Leventhal
> P.O. Box 680096
> Marietta, Georgia 30068

B. Warren Pope



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2004CV85875
Fulton County

May 21st, 2004
10:39am

RONALD S. LEVENTHAL, AN
INDIVIDUAL,DIRECTLY,DERIVATIVELY ON
BEHALF OF POST PROPERTIES, INC., A
GEORGIA CORPORATION, AND
REPRESENTATIVELY ON BEHALF OF ALL
OTHER SIMILARLY SITUATED SHAREHOLDERS
OF POST PROPERTIES,INC.,A GEORGIA
CORPORATION, vs.

Filed : 05/13/2004
Status: Filed
Type: INJUNCTION

Judge
     THELMA WYATT CUMMINGS MO⌐

Court Reporter

| Date | | | | Volume | Page |
|------|---|---|---|--------|------|
| | Plaintiff Information | | | | |
| | PLAINTIFF NAME | | ATTORNEY NAME | | |
| | LEVENTHAL, RONALD S | | PROSE | | |
| | Events & Orders of the Court | | | | |
| 05/13/04 | COMPLAINT FOR DAMAGES (E1) | | | | |
| | EIZ – VERIFIED, DERIVATIVE, INJUNCTIVE AND CLASS ACTION COMPLAINT | | | | |
| 05/13/04 | CASE INITIATION FORM (E2) | | | | |
| | EIZ | | | | |
| 05/13/04 | Jury Trial Requested | | | | |

# General Civil Case Filing Information Form (Non-Domestic)

| | | |
|---|---|---|
| **Court**<br>☒ Superior<br>☐ State | **County** Fulton<br>**Docket #** 2004 CV 85875 | **Date Filed** 05 11 2004<br>MM-DD-YYYY |

**Plaintiff(s)**

Leventhal    Ronald    S    et al.
Last    First    Middle I.    Suffix    Prefix    Maiden

Shareholders of Post Properties Inc.
Last    First    Middle I.    Suffix    Prefix    Maiden

_____    _____    _____    _____
Last    First    Middle I.    Suffix    Prefix    Maiden

_____    _____    _____    _____
Last    First    Middle I.    Suffix    Prefix    Maiden

**No. of Plaintiffs** 2

**Plaintiff/Petitioner's Attorney**    ☒ Pro Se

Leventhal    Ronald    S
Last    First    Middle I.    Suffix

**Bar #** _____

**Defendant(s)**

Goddard    Robert    C.    III    Derek...
Last    First    Middle I.    Suffix    Prefix    Maiden

Stockert    David    P.
Last    First    Middle I.    Suffix    Prefix    Maiden

Cohen    Sherry    W
Last    First    Middle I.    Suffix    Prefix    Maiden

Glover    John    T
Last    First    Middle I.    Suffix    Prefix    Maiden

**No. of Defendants** 9

Papa    Christopher    J
Senkbeil    Thomas    D.
Wilkes    Thomas    L.
Post Properties Inc. Georgia Corporation

---

**Check Primary Type (Check only ONE)**

☐ Contract/Account

☐ Wills/Estate

☐ Real Property

☐ Dispossessory/Distress

☐ Personal Property

☒ Equity - Injunctions; Receiver

☐ Habeas Corpus

☐ Appeals, Reviews

☐ Post Judgment Garnishment, Attachment, or Other Relief

☐ Non-Domestic Contempt

☒ Tort (If tort, fill in right column)

☒ Other General Civil Specify Derivative and Class Action

---

**If Tort is Case Type:**
**(Check no more than TWO)**

☐ Auto Accident

☐ Premises Liability

☐ Medical Malpractice

☐ Other Professional Negligence

☐ Product Liability

☒ Other Specify Breach Fiduciary Fraud, etc

**Are Punitive Damages Pleaded?** ☒ Yes ☐ No

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

RONALD S. LEVENTHAL, an
Individual, Directly, Derivatively on behalf
of Post Properties, Inc., a Georgia
corporation, and Representatively on
behalf of all other similarly situated
Shareholders of Post Properties, Inc., a
Georgia corporation,

    **Plaintiff,**

**v.**

ROBERT C. GODDARD, III, an
Individual and as Chairman of the Board of
Post Properties, Inc., a Georgia
corporation, **DAVID P. STOCKERT,** an
Individual, **SHERRY W. COHEN,** an
Individual, **JOHN T. GLOVER,** an
Individual, **CHRISTOPHER J. PAPA,** an
Individual, **THOMAS D. SENKBEIL,** an
Individual, and **THOMAS L. WILKES,**
an Individual,

    **Defendants,**

**AND POST PROPERTIES, INC.,** a
Georgia corporation,

    **Indispensable Party and Nominal**
    **Defendant.**

**CIVIL ACTION**
**FILE NUMBER**

2004 CV85875

**JUDGE** _____

**VERIFIED, DERIVATIVE,**
**INJUNCTIVE AND CLASS**
**ACTION COMPLAINT**

MAY 13 2004

---

## VERIFIED, DIRECT, DERIVATIVE AND REPRESENTATIVE COMPLAINT
## FOR, *INTER ALIA*, INJUNCTIVE RELIEF AND DAMAGES

    **COMES NOW** Ronald S. Leventhal, an Individual, *In Propria Persona,*

("**Leventhal**"), and [individually], directly, derivatively and representatively on behalf of

Post Properties, Inc., a Georgia Company, ("**Post**" or "**Company**"), files the above-styled

civil action ("**Complaint**") against Robert C. Goddard, III, an individual and as Chairman of the Board of Post Properties, Inc., a Georgia corporation, ("**Goddard**"), David P. Stockert, an individual and as a member of the Board of Directors of Post ("**Stockert**"), Sherry W. Cohen, an individual ("**Cohen**"), John T. Glover, an Individual and as a member of the Board of Directors of Post ("**Glover**"), Christopher J. Papa, an Individual ("**Papa**"), Thomas D. Senkbeil, an individual ("**Senkbeil**"), Thomas L. Wilkes, an Individual ("**Wilkes**"), and Post Properties, Inc., a Georgia Company, Indispensable Party and Nominal Defendant, including, *inter alia*, by and through its Board of Directors ("**Board**"), by and through Goddard as its Chairman, with the Company, Goddard, Stockert, Cohen, Glover, Pappas, Senkbeil and Wilkes, as to each of their respective roles and activities in connection with the facts and claims (and relief sought), set forth in this Complaint, hereinafter referred to as (the "**Defendants**"), showing to this Honorable Court as follows:

**I.**

**INTRODUCTION**

A.

That Leventhal has been a shareholder of Post at all times material and relevant to the matters set forth herein, harmed by among other things, tens of millions of dollars in losses suffered by Post, upon information, at the hands of Defendants.

B.

That Plaintiff Ronald S. Leventhal is an individual shareholder of Post, who has diligently sought, during the last six (6) months, information from and about the Company, including but not limited, from Goddard.

## C.

That notwithstanding efforts to reasonably obtain straight forward answers to various concerns, and to obtain statutorily provided for accounting and other records, Leventhal has been "stonewalled", in his view, without successfully obtaining information to which he is entitled.

## II.

## **BACKGROUND**

### A.

That this Complaint seeks the Court to, *inter alia*, address and adjudge a *plethora* of insidious corporate waste, frauds, thefts, breaches of fiduciary duty and misconduct infecting Post at the hands of, among others, the Defendants, who, upon belief, utilize Post as their hip pocket piggy bank and vehicle for the perpetration of duplicitous rhetoric and *specious* hyperbole of epic proportion, harming the public, Georgia and most of all, its shareholders.

### B.

That Leventhal brings this Complaint after months of investigation and refusals by Defendants, including through the law firm of King & Spalding, LLP, who Leventhal believes has a serious conflict of interest in any further representation of Post or any of the Defendants, to fully cooperate in ceasing from concealing material facts from, among others, its shareholders.

C.

That this Complaint seeks:

(i)        An injunction prohibiting Defendants from carrying out activities adverse

to the Company and its shareholders, relating to (a) management

appertaining to control over the accounting records and related processes

of Post; (b) the negotiations for sale of any of the assets of Post or the

Company in excess of $100,000.00, and of Post in its entirety; (c) the

control over the management, of the various [all] apartment communities

owned by Post ("**Stores**", "**Apartment Properties**", "**Communities**" or

"**Complexes**") (d)   the control over the maintenance the various [all]

Apartment Communities; (e) control over all the disclosures of material

information to the shareholders of Post ("**Shareholders**"), the Securities

Exchange Commission ("**SEC**"), the New York Sock Exchange

("**NYSE**"), the accountants for Post and the State of Georgia ("**Georgia**");

(f) Control over all non-essential (as to Company business), expenditures,

including but limited to so called "perks", including but not limited to

membership and use benefits at the East Lake County Club in Atlanta,

Georgia (g) control over the hiring, firing and directing of any and all

attorneys, experts and consultants rendering service (purportedly) or

actually for Post (h) control over the operation of all subsidiaries of Post,

and the, upon belief, hiring of an executive assistant for Defendant

Goddard, to provide services unrelated to Company business, at

significant expense;

(ii)    A mandatory injunction (*ab initio*), voiding, rescinding or otherwise terminating, as of the "proper" date, any and all employment and benefit agreements, including for any executive assistant to Goddard (who works at Goddard's private office, off-site from Post's headquarters), including but not limited to so-called "golden parachutes", stock options and related benefits inuring to the Defendants, and each of them, and those upon and to whom the Defendants have endowed with Post's assets as an overt or subtle (covert) *quid pro quo* to ingratiate Defendants or some of them to such recipients ("**Recipients**"), and to compromise the perspective of the Recipients as to Defendants or some of them;

(iii)    An injunction prohibiting the Defendants from utilizing Company assets to improperly taint any proper Shareholder proposals, falsely based upon such not being in the best interests of Defendants, manifestly evidencing a conflict of interest of Defendants;

(iv)    An injunction mandating Defendants effect proper repair to all Apartment Properties of Post, and provide [and disclose] the necessary level of security personnel to address, upon belief, increasing levels of crime in various of the Post Apartment Properties, which Defendants knew would occur based upon Defendants willfully leasing, upon belief, various residences within the Apartment Properties to tenants who in the past would not qualify for residency, doing so to mislead the Shareholders as to occupying patrons and occupancy ratios;

(v)   Damages arising out of any in connection with willful, gross and other mismanagement activities of Defendants, *inter alia*, as part of a pattern of active fraud by all or some of them, including but not limited to cause Post to artificially reflect improving funds from operations ("**FFO**"), resulting in tens of millions of dollars in losses of at least assets of Post.

D.

That this Complaint arises out of Defendants', or some of them, upon belief, multiple breaches of (i) their fiduciary obligations, (ii) their ongoing active concealment of and failure to disclose, including with *scienter*, information, which has caused and continues to cause disclosures by the Defendants to be overtly fraudulent, false and misleading and to cause other statements made by Defendants to be false and misleading, as a result of the failures to provide complete disclosures to shareholders and others, including, upon belief, to the State of Georgia, Securities and Exchange Commission ("**SEC**"), the New York Stock Exchange ("**NYSE**") and others, including but not limited to, Post and its shareholders, including but not limited to Plaintiff Leventhal, arising out of, among other things, Defendants' abuse of their control, influence and positions of trust at Post.

E.

That the relief sought herein includes, *inter alia*, the rescission or voiding, *ab initio*, of the employment and similar agreements to which Post and each one of the Defendants, or any of them, are parties.

F.

That the Plaintiff seeks damages, including but not limited to, general, special and punitive.

-6-

## G.

That the Plaintiff seeks an accounting, *inter alia*, pursuant to O.C.G.A. §§ 14-2-1602; 14-2-1620.

## H.

That the Plaintiff seeks the appointment of a Receiver, at least, to investigate certain matters, pursuant to O.C.G.A. § 9-8-1, et seq.

## I.

That the Plaintiff seeks an honest (full disclosure) of among other things, the complete basis and reasons for the repeated termination of contracts [which were to result in a favorable price, but which have not] for the sale of Apartment Communities owned by Post.

## J.

That the Plaintiff seeks an active Receiver to, at least, supervise and oversee the integrity of the sale of the "Stores" or various Apartment Complexes being actively marketed for sale by Post.

## K.

That the Plaintiff seeks the 2004 Proxy to be restated, and for such to be fully transmitted to all shareholders of Post (the "**Shareholders**") prior to any vote by the Shareholders on any matter addressed in this Complaint for which relief is sought.

## L.

That the Plaintiff seeks a restated 2004 Proxy, disclosing the totality of any fraud perpetrated by Defendants, including but not limited as to the balance sheet (asset valuations); income statement (maintenance disclosures); contingent liability(ies); the

compensation or benefit agreements entered into with any of the Defendants, as well as the law firm of King & Spalding, LLP, and other necessary adjustments.

M.

That the Plaintiff seeks an injunction, prohibiting any activities by the Defendants in any operational or control capacity of Post, with respect to, among other things, 1) the sale of Post as an entity; 2) the sale of any assets of Post; 3) the payment of, or obtaining, any debt of Post over $1,000,000.00; 4) the control of accounting information of Post; 5) the entry into any arrangements or agreements appertaining to "perks" or hiring and firing of personnel or contractors, experts, agents, including the law firm of King & Spalding, LLP and accounting firm(s) presently providing services to Post and 6) a Receiver to control the direction of any counsel for Post.

N.

That this Complaint is a shareholder derivative action benefiting Post against Defendants, Goddard, Stockert, Cohen, Glover, Pappas, Senkbeil and Wilkes; A direct action as to certain relief [primarily as to a Receiver, accounting, and certain injunctions] as to Leventhal, a representative action as to an economic recovery for Post as a Company, to benefit all Shareholders and an action to compel the Board, to the extent necessary as relief, to effectuate its duties, including through seeking Class Status, *infra*.

## 2004 SHAREHOLDER PROPOSAL (PROXY DISPUTE)

O.

That consistent with certain aspects of the relief sought by and through the Vasquez Complaint, defined *infra*, appertaining to the compensation arrangements, or executive compensation, for at least, Defendants Goddard, Chairman *Emeritus* and

founder of Post John A. Williams ("**Williams**"), has proposed that the Board of Directors provide to the Shareholders at each annual meeting, the amount of compensation to be paid to the Directors for the ensuing year. The supporting statement by is found at Pages 10 and 11 of the Post Properties April 16, 2004 Shareholder Invitation (the "**Invitiation**") to the annual meeting, scheduled for May 27, 2004 at 9:00 o'clock a.m. (the "**2004 Annual Meeting**").

P.

That in the late fall of 2003, Leventhal had contacted the offices of Post, communicating specifically with Ms. Polly Butler, who is purportedly the investor relations representative for Post ("**Butler**"). In ensuing conversations in the spring of 2004 Leventhal was advised through his representative communicating with Butler that there was a Shareholder Proposal by Mr. Williams, the details of which were available on the internet (the "**Williams 2004 Proposal**")

Q.

That Leventhal also directed inquiry as to whether or not the Company had taken a position with the SEC regarding the Williams 2004 Proposal.

R.

That it was Leventhal's understanding the Company had taken a position regarding the Williams 2004 Proposal and that a copy of such was available on the internet, pursuant to, *inter alia*, Rule 14a-8 of the Securities and Exchange Act of 1934 (the "**Exchange Act**").

S.

That notwithstanding Leventhal's efforts to obtain a copy of any proposals forwarded to the SEC by Williams or the Company, Leventhal was not able to obtain such, either via the internet or directly from the SEC. That while such may have been available, the inquiries of the public as to letters to the compliance division of the SEC were not readily available and were beyond the customary search and review of similar documents published in connection with Post's operations, at least as to Leventhal's prowess.

T.

That a disclosure in the conference call of May 4, 2004 by the Company's representatives, was that the Company had anticipated expenditures of approximately Three Hundred Thousand Dollars ($300,000.00) disputing the 2004 Shareholder Proposal of Williams.

U.

That incredulously, the expenditure of Three Hundred Thousand Dollars ($300,000.00) from the "hip-pocket" bank account that the Directors utilize, who have recommended against the proposal by Williams, is a gross breach of their fiduciary duty, solely for their own gain, to the detriment of the Company.

V.

That upon belief, the Defendants had asked the SEC to allow them not to present the Williams 2004 Proposal to the Shareholders, and were denied relief by the SEC.

W.

That it is unusual for the SEC not to take the position of what was presumably an extensive presentation by Post, presumably through counsel, to the SEC as to why the 2004 Williams Proposal was inappropriate (the "**_Defendants' SEC Loss_**").

X.

That notwithstanding the Defendants' SEC Loss, the Defendants are expending, and intend to expend, hundreds of thousands of dollars attempting to take a position, abusing their positions of trust, against what is clearly and unequivocally, under any and all circumstances, in the best interest of the Shareholders.

Y.

(i) Notably, the position of Post of the Defendants at Page 11 of the 2004 Proxy is in Plaintiff's view, misleading. (ii) While the Proxy states that executive compensation is governed by stringent tests, including based upon NYSE rules, the reality is Chairman Goddard, part-time at best, who maintains his own independent real estate and similar investment operations elsewhere in Atlanta, from which office he primarily operates, is one of the highest, if not disproportionately the highest or second highest, paid Chairman of a publicly traded REIT. (iii) Given Post's current situation, the situation financially over the last twenty-four (24) months, its prognosis, including based upon the torts and other breaches asserted in this Complaint against Goddard and the other Defendants, and others, the purpose and the position of the Company through the 2004 Proxy objecting to the Shareholders having control of the compensation as proposed by Williams, is clearly self serving and grossly in conflict with the duties of each of the Defendants, to the Shareholders and the Company.

## Z.

That the 2004 Proxy and the misleading statements therein, incomplete and therefore misleading at a minimum, regarding the inference that there are stringent tests protecting Shareholder interests and therefore they do not need to vote on the Williams' Amendment in the affirmative in order to protect their interests regarding Goddard's and others' "golden parachutes" and inordinate compensation packages, were circulated by and through use of the United States Mail.

## II.

## THE PARTIES, JURISDICTION AND VENUE

### 1.

That the Plaintiff hereby restates, re-alleges and incorporates herein by reference, the averments contained with in Paragraphs A through C, inclusive of the "Introduction" section, *supra*, and Paragraphs A through Z, inclusive of the "Background" section, *supra*, of this Complaint as if fully set forth hereinafter.

### 2.

That Plaintiff Leventhal is a citizen of Georgia, and has been a Shareholder of Post since the time of the commission of, or the continuation or concealment of, the wrongful acts complained of herein, a shareholder of Post.

### 3.

That Defendant Goddard has been a director of Post Properties since May, 2002, and Chairman of the Board since February, 2003. Since July, 2000, Mr. Goddard has been Chairman and Chief Executive Officer of Goddard Investment Group, a commercial real estate firm focusing in the Atlanta, Dallas, Houston and Denver markets. From 1988

to December, 2000, Mr. Goddard served as Chairman and Chief Executive Officer of the NAI/Brannen Goddard Company, a real estate firm.

4.

That Goddard resides at 3018 Habersham Road, Atlanta, Fulton County, Georgia 30305, where he may be served with a Summons and Service Copy of this Complaint.

5.

That Defendant Stockert has been a Director of Post since May, 2002.  Since July, 2002, Stockert has been President and Chief Executive Officer of Post.  From January, 2001 to June, 2002, Stockert served as Post's President and Chief Operating Officer.

6.

That Stockert resides at 1595 Lazy River Lane, Atlanta, Fulton County, Georgia 30305, where he may be served with a Summons and Service Copy of this Complaint.

7.

That Defendant Cohen has been with Post for eighteen (18) years.  Since October, 1997, she has been an Executive Vice President of Post Corporate Services responsible for supervising and coordinating legal affairs and insurance.  Since April, 1990, Cohen had also been Corporate Secretary.  She was a Senior Vice President with Post Corporate Services from July, 1993 to October, 1997.  Prior thereto, Cohen was a Vice President of Post since April, 1990.

8.

That Cohen resides at 2496 Dellwood Drive, Atlanta, Fulton County, Georgia 30305, where she may be served with a Summons and Service Copy of this Complaint.

-13-

9.

That Defendant Glover has been a director of Post Properties since 1984. From March, 2000 to February, 2003, Glover was Vice Chairman. From 1984 until March, 2000, Glover acted as its President, Chief Operating Officer and Treasurer.

10.

That Glover resides at 1888 Garraux Road, Atlanta, Fulton County, Georgia 30327, where he may be served with a Summons and Service Copy of this Complaint.

11.

That Defendant Papa was named Executive Vice President and Chief Financial Officer for Post on November 4, 2003.

12.

That Papa resides at 133 Peachtree Street, Atlanta, Fulton County, Georgia 30303, where he may be served with a Summons and Service Copy of this Complaint.

13.

That Defendant Senkbeil was named Executive Vice President and Chief Investment Officer for Post in June, 2003.

14.

That Senkbeil resides at 4655 Jett Road, Atlanta, Fulton County, Georgia 30327, where he may be served with a Summons and Service Copy of this Complaint.

15.

That Defendant Wilkes has been the President of Post Apartment Management and the Company's Chief Management Officer since January, 2001. From October, 1997 through December, 2000, he was an Executive Vice President and Director of Operations

-14-

for Post Apartment Management, responsible for the operations of Post communities in the Western United States.

16.

That Wilkes resides at 595 Trimble Lake Court, Atlanta, Fulton County, Georgia 30342, where he may be served with a Summons and Service Copy of this Complaint.

17.

That NOMINAL Defendant Post is a self-administered and self-managed real estate investment trust, owns and operates more than 30,000 apartment homes. Post was a developer and operator of upscale apartment communities in the United States. Post stock trades on the New York Stock Exchange under the symbol "PPS". Post is incorporated under the laws of the State of Georgia and maintains its principal place of business at One Riverside, 4401 Northside Parkway, Suite 800, Atlanta, Georgia 30327-3057, where it may be served with a Summons and Service Copy of this Complaint by serving its Registered Agent, Sherry W. Cohen, at 4401 Northside Parkway, Suite 800, Atlanta, Georgia 30327.

18.

That while many of the acts complained of herein occurred in Georgia, others have occurred via the use of the intrastate and therefore interstate telephonic (including telecopier) transmission lines, and via use of the United States Mail, and common carriers, as well as in other jurisdictions.

19.

That the amount in controversy is in excess of the jurisdictional minimum of this Superior Court.

20.

That although this action is not removable to the United States District Court, since no federal remedy is sought, although violations of federal laws are asserted as the basis for state law sought relief, it is possible that should Plaintiff file an action in the United States District Court, Northern District of Georgia, supplemental jurisdiction therein would then be proper.

21.

That venue is proper in Fulton County.

22.

That the acts, conduct and transactions complained of herein occurred in substantial part in this county, where many relevant witnesses reside and all of the Defendants reside, therefore all the Defendants are subject to the jurisdiction of this Court.

23.

That subject matter jurisdiction is proper in this Superior Court.

III.

FACTS

24.

That the Plaintiff hereby restates, re-alleges and incorporates herein by reference, the averments contained with in Paragraphs A through C, inclusive of the "Introduction" section, *supra*, and Paragraphs A through Z, inclusive of the "Background" section, *supra*, and Paragraphs 1 through 23, inclusive of the "Parties, Jurisdiction and Venue" section, *supra*, of this Complaint as if fully set forth hereinafter.

-16-

25.

That the Defendants jointly have caused the Company to provide benefits packages to the Defendants by soliciting, causing and allowing the Company's agents and professional advisers to make decisions regarding Defendants' benefits while operating under conflicts of interest which conflicts Defendants had a duty to prevent (the "**Conflicts**").

26.

That Defendants knew of the Conflicts and willfully failed to protect the Company by eliminating same.

27.

That the Conflicts include, but are not limited to, their misuse of Post assets to benefit one another, to the detriment of the Shareholders by supporting each other's compensation and benefits, while falsely representing to the Shareholders and others that: (1) occupancy of Apartment Properties is meaningfully improving (including net benefits); (2) maintenance of Apartment Properties is consistent with historic pinnacles [which it is not]; (3) that the value (for sales and market purposes) of various Apartment Properties has not diminished while Post has been under the control of Defendants; (4) that a full, complete and un-obfuscated accounting of the true financial condition of Post has been and is being published by Defendants to the Plaintiff and Shareholders and others, which, upon belief, it is not and (5) that perks benefiting the Defendants are consistent with what is appropriate for the true financial condition of Post.

-17-

28.

That when Goddard was interviewed for the Chairman's position, he presumably made certain representations to the Board, or its members.

29.

That absent any change in circumstances, upon belief, he caused his compensation to be increased in a conspiracy with Defendants, in a manner and to a degree that is not in the best interests of the Company, by exerting improper influence by giving perks to decision makers, which perks that were not disclosed to the majority of the Board or the Shareholders.

30.

That upon belief, two employees of the Company learned of the Defendants' or some of their improper collusion to divert Company assets for their own benefit, including the compensation package for Goddard.

31.

That the Defendants, upon belief, caused those employees to be terminated.

32.

That to conceal their improper collusion, the Defendants caused the Company to provide significant separation benefits to such employees, to, upon belief, induce the employees to remain silent concerning activities of the Defendants.

33.

That the two (2) terminated employees were Messrs. Fox and Gray, as is more fully addressed *infra*.

34.

That, upon belief, the Defendants authorized additional benefits for certain members of the Board of Directors and "key" employees of the Company, as an improper inducement to such persons to secure their active support or tacit acquiescence to the Defendants' misappropriation of Company assets for their own personal benefit.

35.

That, upon belief, the Defendants knowingly allowed diversion and appropriation of Company assets by: (A) permitting certain Board members and key employees to enrich themselves (i) by acquiring goods and (ii) services at Company expense, by charging such to the expense accounts of the Company, when upon belief the purchases and benefits alleged in this paragraph had (B) no proper Company purpose and (C) provided no benefit to the Company.

36.

That, upon belief, to mislead shareholders and investors, and to conceal the misappropriation an improper use of Company assets, Defendants have caused false and misleading financial statements to be prepared and disseminated to Plaintiff, among others.

37.

That, upon belief, Defendants caused the Company to provide rental incentives for various Apartment Properties, which have lessened the value of various of the Stores.

38.

That, upon belief, the rental incentives were designed to increase occupancy of certain of the Apartment Properties, so that Defendants might falsely assert to

Shareholders that performance as relates to, at least, funds from operations ("**FFO**"), were within a proper range.

39.

That, upon belief, however, Defendants have been engaging in a scheme to conceal the cost of such incentives from the Shareholders by, among other things, (A) carrying inflated values of various of the assets of Apartment Properties on the balance sheet of Post and (B) among other possible means, falsely failing to reflect the rental concessions as charges against the revenue of the Company on the income statement.

40.

That, upon belief, Defendants have reduced the working hours of resident managers of certain of the Apartment Properties, which have resulted in resident managers not been available on the days on which relevant rental communities are most likely to show units to prospective renters.

41.

That Defendants have secured "golden" parachute agreements which result in greater benefit to the Defendants should a buyer for Post, as an entity, be found.

42.

That the Defendants have placed their personal interests before that the Company.

43.

That, upon belief, however the Defendants' actions constitute an impermissible gambling of the corporate assets and long-term health at the expense of the Shareholders and the Company's financial health in the longer term.

44.

That, upon belief, the Defendants have caused precipitous declines in maintenance of the properties of the Company, in order to (A) reduce expenses and (B) thereby to show falsely improved performance on the Post income statement.

45.

That, upon belief, Defendants, however, have not properly adjusted the value of the assets of the balance sheet of Post to reflect the lower values caused by the lower levels of maintenance.

46.

That, upon belief, Defendants have agreed to and Goddard has accepted, converted and appropriated to his own use, and that of other unrelated entities [as to Post], substantial funds to compensate an executive assistant for Goddard, performing services unrelated to Post's business (the "**Goddard Assistant**").

47.

That, upon information, Post has secured a membership at East Lake Country Club, located at 2575 Alston Drive, SE, Atlanta, Fulton County, Georgia (the "**East Lake Benefits**").

48.

That the East Lake Benefits are, upon information, allocated by Defendants, including specifically Glover.

49.

That, upon belief, purchases of goods and services at East Lake are charged to Post, but are not for the benefit of Post, but benefit the conspiracy of Defendants to

maintain control of Post.

50.

That Plaintiff has complied with the requisite demand requirement of Georgia law on February 4, 2004, and the Company has failed to refuse to take corrective action, and did not provide a satisfactory response to the Demand in their letters of February 13, 2004 and May 3, 2004.

51.

That Plaintiff has requested certain corporate records to investigate the value (accounting) of the corporate shares in the form of a demand transmitted on March 27, 2004.

52.

That Defendants, through correspondence dated April 2, 2004, failed and refused to produce the requested documents.

**Derivative Demand Facts**

53.

That the Derivative Demand letter was served by Leventhal on Mr. Robert C. Goddard, III, Chairman of the Board, Post Properties, Inc., 3390 Peachtree Road, Suite 1200, Atlanta, Georgia 30326 on February 4, 2004 (the "**Derivative Demand**").

54.

That the Derivative Demand referenced Ownership interest in Post held by Leventhal, other entities and interested persons holding an ownership interest, and that Leventhal was pursuing a proper shareholder inquiry.

-22-

55.

That the Derivative Demand was written pursuant to, *inter alia*, Official Code of Georgia Annotated ("O.C.G.A.") § 14-2-742 constituting an official demand (the "**Demand**"), by the Plaintiff for, among others, his own account.

56.

That Plaintiff though the Demand, requested, based upon the concerns set forth, *infra*, that the Board of Directors of Post undertake an investigation within the ninety (90) day requirement of O.C.G.A. § 14-2-742(2), while asserting such requirement to be non-applicable with respect to the filing of a derivative complaint, in a lesser period of time.

57.

That Plaintiff pursuant to O.C.G.A. § 14-2-830 and O.C.G.A. § 14-2-831, set forth that the concerns defined in the Demand, evolved out of and in connection with the carrying out of the duties by the Directors, to the extent the Directors are complicit in any of the matters set forth, *infra*.

58.

That to the extent the Directors were not aware of the concerns set forth, *infra*, appertaining to senior management, including the Defendants, the Demand was for the Directors to address the concerns pursuant to their obligations respecting any misdeeds of any officers (Defendants), as is set forth in, *inter alia*, O.C.G.A. § 14-2-831(a)(1)(A), (B) and (C), (the "**Concerns**").

59.

That Leventhal requested upon the conclusion of the investigations of the Concerns, the Board was to effect the *removal of certain of the officers* (Defendants)

-23-

who, upon belief, are culpable in connection with any of the Concerns, their validity being confirmed by events and disclosures subsequent to February 4, 2004, pursuant to, *inter alia*, O.C.G.A. § 14-2-843(b).

60.

That particularly as to the Concerns of Leventhal appertaining to any loss of earnest money, excessive burdens or costs to the Company at the expense of the Shareholders, failure to disclose such on the Company's financial statements, any changes in the accounting practices respecting reserves for replacement of fixtures and equipment in Apartment Communities, maintenance of the various assets and similar matters, the Demand was that any further indemnification of the officers, employees or agents (Defendants) involved, be expressly denied, as is provided for in O.C.G.A. § 14-2-857 et seq.

61.

That the Demand sought, as to any Director who is also active in the operations of the Company on more than an occasional basis, *i.e.* Defendant Goddard, as Chairman, if any of the acts which comprised Concerns were verified or not completely undisputed and (including Goddard) refuted under oath, that any indemnification for any such Director be declared void, *ab initio* and of no force or effect as to any misdeed, thereby protecting the interests of the Shareholders against the costs of such indemnification in favor of "Goddard," to the extent not insured, pursuant to, *inter alia*, O.C.G.A. § 14-2-856 *et seq.*

-24-

62.

That the Concerns set forth in Leventhal's Demand, emanate out of and were consistent with previous communications to Post.

63.

That as a Shareholder who has written to Goddard in the past, without direct response, Leventhal continued to be astounded by "street talk" confirmed, at least in *salient* part, by the Post website at Yahoo; For example, Leventhal asserted the website was on point with regard to Concerns respecting Mr. Barry Teague's decision not to acquire the Post asset(s) in Atlanta.

64.

That Leventhal requested details as to that decision and Goddard refused to provide those; Leventhal asserted that for Mr. Teague to not avail himself of the ability to utilize some of his "units," as part of the purchase price of a Post Apartment Property, would likely mean that there were valid problems in the real estate which caused him to abate from proceeding.

65.

That Leventhal asserted the overriding problems are not only the issues which manifest as a result of such, but moreover, the issues are as to when the Company knew, even of the likelihood, that Mr. Teague would not proceed, which the Defendants concealed willfully, from the Shareholders.

66.

That in a press release, Defendants stated that assets would be sold in the first quarter, which included, presumably, the assets which were previously under contract to Mr.

Teague; From everything Plaintiff could ascertain, the sale fell apart, and only "a letter of intent" then existed as to the sale.

67.

That given the Company, for the benefit of its Shareholders, had determined to dispose of somewhere over $300 million or more of its assets. Leventhal asserted a letter of intent seems "weak," therefore, the publishing of the reasons for failed sales were requested.

68.

That the disclosure of the arrangements with a sophisticated purchaser, who had agreed to acquire the various assets of Post, for the benefit of the Company, is important for regulatory and other compliance purposes; For the transaction with the buyer(s) (Defendants said would close a large purchase), to not have been concluded, for any reason, or to be in disarray, requires an accounting to the Shareholders.

69.

That includes, *inter alia* disclosure of how much earnest money Post received from escrow, given such was not located on the disclosed financial information, or otherwise obfuscated.

70.

That Leventhal demanded an accounting as to costs involved in any anticipatory *terminations of employees* due to failed or delayed sales of Apartment Properties.

71.

That Leventhal demanded disclosure of severance payments, appertaining and relating thereto, including the complete details of the termination (voluntary, anticipatory

-26-

or otherwise), of any employees relating to each and every one of the assets that comprise the portion of the Post portfolio, that were or are to be disposed of, as part of the hundreds of millions of dollars in touted sales, by Defendants.

72.

That in connection therewith, Leventhal requested the details of the compensation packages or severance packages appertaining thereto.

73.

That Leventhal additionally requested disclosure, fully, of the costs respecting the time involved and any curative measures taken, to satisfy any objections by Mr. Teague or any other buyers (objection letters pursuant to inspections), arising out of the factors which have lead to any "terminated purchase and sale contracts."

74.

That Leventhal requested whether failed buyers determined that there were maintenance issues (which would be unheard of for a Post asset), giving rise to a lack of reserves in Post's financials, to cover such.

75.

That Leventhal requested disclosure of the failure to set up reserves to replace equipment, if cannibalizing of appliances was occurring at Post.

76.

That Leventhal inquired as to whether and when news of the loss of an important contract for approximately One Hundred Million Dollars ($100,000,000.00) arrived, if Defendants were "cruising the Caribbean" (at Company expense), and if they terminated their vacations and returned promptly to Atlanta to address the emergency?

-27-

77.

That Leventhal's Concerns set forth in the Derivative Demand Letter were as follows:

A.   That the assets that were represented to be liquidated in this quarter, which have not been for the price represented, are purportedly under a letter of intent based upon the Company's information officer; why is there only a letter of intent?

B.   What happened to any contracts (purchase and sale agreements)?

C.   What happened to any earnest money from any contracts, if earnest money was received?

D.   If not, why was earnest money not received?

E.   Was any earnest money accounted for to the extent received?

F.   With respect to the failure of the sale of any of the Company's assets to Mr. Barry Teague or otherwise, what were the precise and exact reasons for such basis, outside of any normal posturing by a purchaser as an attempt to negotiate a better price, *i.e.* for example?

G.   Were there were legitimate concerns respecting a decrease in the maintenance of any of the properties or assets?

H.   Is there a decrease in the level of replacement fixtures on hand, in any of the assets?

I.   Has there been any cannibalizing or shifting of any equipment from apartments, in this market, which are temporarily not being leased, to other apartments (residences) which are being leased, without a corresponding adjustment to the Company's accounting information for shareholders to be

advised that the reserves for replacement for such maintenance and fixture/appliances must be increased, and at present that such accounting has been understated?

J.    Has there been a pattern of waiving the historic pattern of the stream of collected lease payments from any of the residents, on any basis?

K.    Are there free "giveaways" of any type as part of the process of seeking to rent any of the assets?

L.    In connection with such leasing, are there concessions being provided to prospective tenants that are not being fully disclosed, in terms of the economic implications, to the shareholders on short-term and on a long-term valuation basis (*i.e.* that in a recovering market, presumably when interest rates are higher that it will be difficult to raise the rental or lease payments to be received from tenants/residents because of an over reaction by management, at present, in concessions leading to a lowering of the overall value of our portfolio, from an income stream standpoint)?

M.    Do our employees remain available, full time, as to resident managers to receive inquires from prospective residents? I know that is not the case, at least, at Post Mill.

N.    Is there a morale problem in the operations of the Company with respect to the displacement of employees, both based upon mis-anticipation of sales of assets or otherwise?

O.    Has there been a full and complete accounting of the cost of such, including but not limited to, any replacement costs for such personnel?

-29-

P.    Have there been any comments from employee respecting the overall morale of the personnel of our Company?

Q.    What steps have taken with specificity to address such?

R.    With respect to the change in the financial structure of certain of the lines of credit of the Company, by proceeding from fixed lines of credit in terms of interest rate to variable rates, has a reserve been set up at the direction of the Board and senior management to provide for a "buy down" of a rate in the future, for a comparable fixed line of credit, should interest rates increase?

S.    Has the cost of such been factored into the Company's financial reporting?

T.    What controls are in place with respect to the huge sales of Company's asset, as to details with brokers?

U.    What is the relationship of any of the brokers to the Company or senior or other management?

V.    Who on behalf of the Company is in control of the Brother negotiations?

W.    What is the cost to the Company and the involvement of the Company in terms of assisting prospective purchasers during any inspection periods, under any contracts to sell any of the assets?

X.    What should have the costs been to address any of those revelations by prospective purchases?

Y.    Where are those specifically set forth in the financial information provided to the shareholders?

Z.    At what point in time did senior management or any member of the Board of Directors know or have reason to believe, of the decision not to purchase our

assets, such as to Mr. Barry Teague or any other purchaser of any assets that announced by the Company, in terms of revealing such to the shareholders, as compared to the date the Company actually knew or had reason to believe such sale(s) would not occur?

AA.     What has the Company learned from its negotiations for the sale of any of any of its assets, which in any way contradict or are in conflict with the valuations placed upon those assets, by the Company, by outside appraisers or otherwise, as compared to the views of the purchasers?

BB.     Has that information been disclosed to the shareholders?

CC.     Has any other information, appertaining to the Company, its future and current conditions, not been disclosed to the shareholders?

DD.     The assets that were represented to be liquidated in this quarter, which have not been for the price represented, are purportedly under a letter of intent based upon the Company's information officer; why is there only a letter of intent?

EE.     What happened to any contracts (purchase and sale agreements)?

FF.     What happened to any earnest money from any contracts, if earnest money was received?

GG.     If not, why was earnest money not received?

HH.     Was any earnest money accounted for to the extent received?

II.     With respect to the failure of the sale of any of the Company's assets to Mr. Barry Teague or otherwise, what were the precise and exact reasons for such

basis, outside of any normal posturing by a purchaser as an attempt to negotiate a better price, *i.e.* for example?

JJ.  Were there were legitimate concerns respecting a decrease in the maintenance of any of the properties or assets?

KK.  Is there a decrease in the level of replacement fixtures on hand, in any of the assets?

LL.  Has there been any cannibalizing or shifting of any equipment from apartments, in this market, which are temporarily not being leased, to other apartments (residences) which are being leased, without a corresponding adjustment to the Company's accounting information for shareholders to be advised that the reserves for replacement for such maintenance and fixture/appliances must be increased, and at present that such accounting has been understated?

MM.  Has there been a pattern of waiving the historic pattern of the stream of collected lease payments from any of the residents, on any basis?

NN.  Are there free "giveaways" of any type as part of the process of seeking to rent any of the assets?

OO.  In connection with such leasing, are there concessions being provided to prospective tenants that are not being fully disclosed, in terms of the economic implications, to the shareholders on short-term and on a long-term valuation basis (*i.e.* that in a recovering market, presumably when interest rates are higher that it will be difficult to raise the rental or lease payments to be received from tenants/residents because of an over reaction by management,

-32-

at present, in concessions leading to a lowering of the overall value of our portfolio, from an income stream standpoint)?

PP.    Do our employees remain available, full time, as to resident managers to receive inquires from prospective residents? I know that is not the case, at least, at Post Mill.

QQ.    Is there a morale problem in the operations of the Company with respect to the displacement of employees, both based upon mis-anticipation of sales of assets or otherwise?

RR.    Has there been a full and complete accounting of the cost of such, including - but not limited any replacement costs for such personnel?

SS.    Have there been any comments from employee respecting the overall morale of the personnel of our Company?

TT.    What steps have taken with specificity to address such?

UU.    With respect to the change in the financial structure of certain of the lines of credit of the Company, by proceeding from fixed lines of credit in terms of interest rate to variable rates, has a reserve been set up at the direction of the Board and senior management to provide for a "buy down" of a rate in the future, for a comparable fixed line of credit, should interest rates increase?

VV.    Has the cost of such been factored into the Company's financial reporting?

WW.    What controls are in place with respect to the huge sales of Company's asset, as to details with brokers?

XX.    What is the relationship of any of the brokers to the Company or senior or other management?

YY.   Who on behalf of the Company is in control of the broker negotiations?

ZZ.   What is the cost to the Company and the involvement of the Company in terms of assisting prospective purchasers during any inspection periods, under any contracts to sell any of the assets?

AAA.  What should have the costs been to address any of those revelations by prospective purchases?

BBB.  Where are those specifically set forth in the financial information provided to the shareholders?

CCC.  At what point in time did senior management or any member of the Board of Directors know or have reason to believe, of the decision not to purchase our assets, such as to Mr. Barry Teague or any other purchaser of any assets that announced by the Company, in terms of revealing such to the shareholders, as compared to the date the Company actually knew or had reason to believe such sale(s) would not occur?

DDD.  What has the Company learned from its negotiations for the sale of any of any of its assets, which in any way contradict or are in conflict with the valuations placed upon those assets, by the Company, by outside appraisers or otherwise, as compared to the views of the purchasers?

EEE.  Has that information been disclosed to the shareholders?

FFF.  Has any other information, appertaining to the Company, its future and current conditions, not been disclosed to the shareholders?

78.

That a copy of the Demand was sent to Mr. Robert C. Goddard, III, Chairman of

the Board, Post Properties, Inc., 4401 Northside Parkway, Suite 800, Atlanta, Georgia

30327, Via Certified U.S. Mail. Return Receipt Requested number7099 3220 0010 8294

5162 and to all Directors of Post, Via First Class U.S. Mail: Mr. Robert L. Anderson,

President Ronus, Inc.3290 Northside Parkway, Suite 225Atlanta, Georgia 30327. Mr.

Nicholas B. Baumgarten, Managing Director, J.P. Morgan Corsair II, Capital Partners,

L.P. 227 Park Avenue, 23rd Floor, New York, NY   10172-3401.  Mr. Herschel M.

Bloom, Attorney at Law, Partner, King & Spalding, LLP, 191 Peachtree Street, Atlanta,

Georgia   30303. Mr. Douglas Crocker, III, 437 East North Water, Chicago, Illinois

60611. Mr. Walter M. "Sonny" Deriso, Vice Chairman, Synovus, 901 Front Avenue,

Suite 301, Columbus, Georgia   31901.  Mr. Ronald de Waal, Chairman, de Waal

International Management N.V., Ertbruggestraat 136, 2110 Wignegen, Belgium. Mr.

Russell R. French, General Partner, Noro-Moseley Partners, 4200 Northside Parkway,

Nine Northside Parkway, Atlanta, Georgia   30327.  Mr. John T. Glover, Managing

Partner, J&SG  Investments, LLC, c/o Post Properties, Inc., 4401 Northside Parkway,

Suite 800,    Atlanta, Georgia   30327.  Mr. Charles E. Rice, Chairman, Mayport

Venture Partners, LLC, 50 North Laura Street, Suite 1208, Jacksonville, Florida  32202.

Mr. John A. Williams, Chairman Emeritus, Post Properties, Inc., 4401 Northside

Parkway, Suite 100, Atlanta, Georgia   30327, and to: Mr. David P. Stockert, Chief

Executive Officer, Post Properties, Inc., 4401 Northside Parkway, Suite 800, Atlanta,

Georgia 30327, Via Certified U.S. Mail, Return Receipt Requested, 7099 3220 0010 8294

5155. Also Via Telecopier: (404) 846-6282. Ms. Sherry W. Cohen, Executive Vice

President and Corporate Secretary, Post Properties, Inc., 4401 Northside Parkway, Suite 800, Atlanta, Georgia 30327, Via Certified U.S. Mail Return Receipt Requested 7099 3220 0010 8294 5148, also Via Telecopier: (404) 504-9388. Mr. Thomas D. Senkbeil, Executive Vice President and Chief Investment Officer, Post Properties, Inc., 4401 Northside Parkway, Suite 800, Atlanta, Georgia 30327, Via Certified U.S. Mail Return Receipt Requested 7099 3220 0010 8294 5131.

79.

That the Derivative Demand letter was served on Mr. Robert C. Goddard, III, Chairman of the Board, Post Properties, Inc., 3390 Peachtree Road, Suite 1200, Atlanta, Georgia 30326.

80.

That the subsequent Accounting Demand letter of March 27, 2004, was written pursuant to, *inter alia*, Official Code of Georgia Annotated ("O.C.G.A.") § 14-2-1602 constituted an official request (the "**Accounting Request**"), by Leventhal for his own account and the account of others.

81.

That the Accounting Request is in connection with and to further address the Concerns, including pursuant to any misdeeds of any officers, as is set forth in, *inter alia*, O.C.G.A. § 14-2-831(a)(1)(A), (B) and (C).

82.

That there has been no satisfactory response to the Concerns, including as appertaining to various acts and possible failures to act, consistent with fiduciary duties, by among others, Defendants.

-36-

83.

That the Concerns, directly and in some instances indirectly, relate to corporate waste, including as to "good will".

84.

That the Accounting Request constituted a Formal Request pursuant to O.C.G.A. § 14-2-1602 *et seq.*

**Part One of Leventhal's Accounting Request to Post:**

85.

That Leventhal requested all written communications, to and from, any and all Shareholders of the Company, since January 1, 2003, appertaining in any way to issues or matters of or relating to the economy(s) of the Company, "money", salaries, bonuses, "golden" parachutes and similar matters, including the financial statements furnished for the past two (2) years, by the Company, to anyone, pursuant to O.C.G.A. § 14-2-1620.

**Part Two of Leventhal's Accounting Request to Post:**

**[For Time Period Beginning January 1, 2003]**

86.

That Leventhal requested review of the following records to investigate his Concerns, as defined and set forth in his Derivative Demand Letter, which are repeated, *infra.*

87.

That Leventhal sought those records in good faith, solely to investigate the stated Concerns, all of which affect the value of his stock. Those records were:

-37-

## Accounting Documents Requested Pursuant to Accounting Request

### Request Number 1

All accounting records regarding the stores (or, stated differently, individual apartment communities) which have been the subject of any proposed sale or actual contracts for sale during the past 24 months, including but not limited to, the following source documents:

(A)    Maintenance records, including but not limited to, the details of; painting, re-carpeting, appliance replacement, general interior and exterior repairs, complaints by anyone or any entity respecting maintenance or quality, or both, (based on the historic good will of the Post name) as appertains to the quality (i.e. interior, exterior, landscaping, accessibility of staff, security and professionalism) and reputation of Post Apartment Homes.

(B)    All records delineating any transfer of appliances (refrigerators, stoves, ovens, trash compactors, water heaters, etc.) from one apartment home, within any same store or community, to another, and between communities, or both, if such applies.

(C)    All records delineating any requests by resident managers, maintenance staff, residents (tenants), for changes (exchanges) of any appliances and the resulting action (or inaction).

(This Request is generally related to Concern Numbers 8 and 9), *supra.*

### Request Number Two

(A)    All records identifying the attention of management (time spent, on site), including but not limited to, resident managers, as to each of the communities which

were, or are, the subject of a proposed or actual contract ("Agreement") for sale or disposition.

(B)     Any documents which evidence the hours and dates that resident managers have been on-site at such communities, such as time sheets, logs and voice mail records, which reflect when the resident managers have been on-site.

(This Request is generally related to Concern Numbers 13 and 14), *supra*.

### Request Number Three

All records reflecting or identifying pending required maintenance, whether by virtue of resident requests, prospective resident requests or otherwise, and documents evidencing how such maintenance costs or anticipated costs are reflected in the financial reserves, as reflected in the standard accounting information made available to the shareholders.

(This Request is generally related to Concern Numbers 7, 8 and 9), *supra*.

### Request Number Four

Copies of all completed contracts/Agreements for the sale of any community or group of communities, or both, (no longer pending, but which was pending).

(This Request is generally related to Concern Numbers 2, 3, 4, 6, 20-23, and 26-28), *supra*.

### Request Number Five

All books and records reflecting earnest money paid on contracts for sale of any community or group of communities, whether or not such contracts/Agreements were consummated.

(This Request is generally related to Concern Numbers 2-6), *supra*.

### Request Number Six

All reports and communications relating to inspections performed pursuant to and in connection with any previously or otherwise *pending* contract, *Agreement*, appertaining to any proposed sale of any community, or group of communities, or both, including without limitation, items that did, would, could or should have had an impact on the sales price or which were the subject of negotiations as to sales price.

(This Request is generally related to Concern Numbers 6, and 20-29), *supra.*

### Request Number Seven

All communications, including, but not limited to, (photographs, sketches, writings, e-mails, facsimiles, voice mail and summaries of telephonic or *in persona*, conversations), leading up to, subsequent to, and related in any way to, any contracts/Agreements to sell any community, or group of communities, or both, whether pending or completed (closed or terminated), [Note: with regard to any currently pending Agreement, feel free to redact the name of the purchaser and the names of purchaser's agents].

(This Request is generally related to Concern Numbers 1, 2, 6, 20-23 and 26-29), *supra.*

### Request Number Eight

All commission agreements with realtors who marketed or listed any store (community) or group of communities, or both, whether enforced or not.

(This Request is generally related to Concern Numbers 10-12, 20-22, and 28-29), *supra.*

### Request Number Nine

All accounting records, evidencing any payments to real estate brokers, real estate agents, attorneys, accountants, officers or employees of the Company and other

individuals, including but not limited to payments made to third persons, for disclosed or undisclosed referral or other fees or renumerations.

(This Request is generally related to Concern Numbers 20-25 and 28-29), *supra*.

## Request Number Ten

All accounting records delineating payments made to the Company or any subsidiaries, as income (receipts), not derived directly from the operation of the stores (communities), together with all invoices related thereto and adjustments to same.

(This Request is generally related to Concern Number 9), *supra*.

## Request Number Eleven

All accounting records delineating payments by the Company or any subsidiary of the Company, or both, to any officers and directors of the Company (or from Post to any subsidiary of the Company), or both.

(This Request is generally related to Concern Number 28), *supra*.

## Request Number Twelve

All accounting records that reflect, evidence or otherwise indicate, by inclusion or omission, lease concessions, discounts, "give-a-ways", or credits to residents (tenants), in order to induce such persons to reside in or remain as a resident in any of the stores (communities).

(This Request is generally related to Concern Numbers 2, 6, 10, 11, 12 and 13), *supra*.

## Request Number Thirteen

All accounting records reflecting value of services provided to officers and directors of the Company and any subsidiaries, for transportation, entertainment, country club dues and "other perks" or benefits, together with all records reflecting any bills or

invoices for such services and benefits, or either, and any reimbursements made to the Company, or any subsidiary, for such services or benefits, "perks", and similar items or matters.

(This Request is generally related to Concern Number 29), *supra*.

### Request Number Fourteen

All accounting records reflecting the compensation (whether by salary, bonus, stock option or otherwise, including by virtue of payments on behalf of such persons to others) paid to officers and directors or persons related to such officers or directors as defined by O.C.G.A. §14-2-860(3), or to either (i) an entity (other than the Company and any subsidiary) of which the director or officer is a director, officer, a general partner, agent, or employee; (ii) a person that controls one or more of the entities specified in division (i) or an entity that is controlled by, or is under common control with, one or more of the entities specified in division (i) of this subparagraph; or (iii) an individual who is a general partner, principal, or employer of the director.

(This Request is generally related to Concern Number 29), *supra*.

### Request Number Fifteen

All severance payments (of any kind, including non-cash), to any employee, officer, agent, resident manager, maintenance personnel (direct or through any entity), and hiring bonus (packages), including as to Messrs. R. Gregory Fox and Douglas S. Gray, including as to stock options, distributions, payments for travel (ships, boats, etc.) by the Company or any subsidiary.

(This Request is generally related to Concern Number 29), *supra*.

-42-

### Request Number Sixteen

All documents from any source, evidencing any inquiries, challenges, claims, allegations of any kind, character and nature, or any of the foregoing, to the accounting procedures, practices and financial acts, failures to act and conduct of the Company, any subsidiary, any of its senior management (the "Accounting Objections"), together with all documents in response to such Accounting Objections.

(This Request is generally related to Concern Number 29), *supra*.

### Request Number Seventeen

All documents evidencing any adjustments to "good will" or for any devaluation or decrease in the good name of Post.

(This Request is generally related to Concern Number 29), *supra*.

### Request Number Eighteen

All documents evidencing any payment of (in cash, clerk, severance, bonus, stock option, or other benefit(s)) any kind, character or nature, directly or indirectly, to any person, persons,  entity, or any of the foregoing, which could be interpreted, notwithstanding the position officially asserted by the Company, to have been provided for the purpose of causing that person, persons, entity, or any of the foregoing, including but not limited to Messrs. R. Gregory Fox and Douglas S. Gray, or either, or both, from disclosing, publicly or otherwise, including to any governmental agency having competent jurisdiction over the activities of the Company, any information or facts, or either or both, whether accurate or inaccurate, which would or could have an actual, implied, or any perceived, adverse impact upon you. or any member of senior management, or any member of the Board of Directors. or any of the foregoing.

(This Request is generally related to Concern Number 29), *supra*.

88.

That Leventhal requested the inspection take place on April 5, 2004, that a reasonable estimate of any charges or costs associated with complying with the request solely pursuant to O.C.G.A. §14-2-1603, be provided.

89.

That a copy of the Accounting Request was served upon

Mr. Robert C. Goddard, III
Chairman of the Board
Post Properties, Inc.
4401 Northside Parkway, Suite 800
Atlanta, Georgia 30327
[Via Certified U.S. Mail
Return Receipt Requested
Article Number 7002 3150 0002 2791 3987]
[Also Via Telecopier (404) 442-5501]

Mr. Robert Thornton
Attorney at Law
King & Spalding LLP
191 Peachtree Street
Atlanta, Georgia 30303-1763
[Via Telecopier (404) 572-5142]

To All Directors of Post,
Via First Class U.S. Mail:

Mr. Robert L. Anderson, President
Ronus, Inc.
3290 Northside Parkway, Suite 225
Atlanta, Georgia 30327

Mr. Nicholas B. Baumgarten
Managing Director
J.P. Morgan Corsair II
Capital Partners, L.P.
227 Park Avenue, 23rd Floor
New York, NY 10172-3401

-44-

Mr. Herschel M. Bloom
Attorney at Law
Partner, King & Spalding
191 Peachtree Street
Atlanta, Georgia  30303

Mr. Douglas Crocker, III
437 East North Water
Chicago, Illinois  60611

Mr. Walter M. "Sonny" Deriso
Vice Chairman, Synovus
901 Front Avenue, Suite 301
Columbus, Georgia  31901

Mr. Ronald de Waal
Chairman, de Waal International Management N.V.
Ertbruggestraat 136
2110 Wignegen
Belgium

Mr. Russell R. French
General Partner, Noro-Moseley Partners
4200 Northside Parkway
Nine Northside Parkway
Atlanta, Georgia  30327

Mr. John T. Glover
Managing Partner, J&SG Investments, LLC
c/o Post Properties, Inc.
4401 Northside Parkway, Suite 800
Atlanta, Georgia  30327

Mr. Charles E. Rice
Chairman, Mayport Venture Partners, LLC
50 North Laura Street, Suite 1208
Jacksonville, Florida  32202

Mr. John A. Williams
Chairman Emeritus
Post Properties, Inc.
One Overton Park
3625 Cumberland Blvd.
Suite 400
Atlanta, Georgia  30339

And to:

Mr. David P. Stockert
Chief Executive Officer
Post Properties, Inc.
4401 Northside Parkway, Suite 800
Atlanta, Georgia 30327
[Via Certified U.S. Mail
Return Receipt Requested
Article Number 7002 3150 0002 2791 3994]
[Also Via Telecopier: (404) 504-9388]

Ms. Sherry W. Cohen
Executive Vice President and Corporate Secretary
Post Properties, Inc.
4401 Northside Parkway, Suite 800
Atlanta, Georgia 30327
[Via Certified U.S. Mail
Return Receipt Requested
Article Number 7002 3150 0002 2791 4007]
[Also Via Telecopier: (404) 504-9388]

Mr. Thomas D. Senkbeil
Executive Vice President and Chief Investment Officer
Post Properties, Inc.
4401 Northside Parkway, Suite 800
Atlanta, Georgia 30327
[Via Certified U.S. Mail
Return Receipt Requested
Article Number 7002 3150 0002 2791 4014]
[Also Via Telecopier: (404) 504-9388]

90.

That no satisfactory response has been provided by Defendants to the Accounting

Request.

91.

That on May 2, 2003, an action against certain of the Defendants, styled *Amy*

*Vasquez, on Behalf of Herself and All Others Similarly Situated and Derivatively on*

*Behalf of Post Properties, Inc. v. Robert L. Anderson, et al., Civil Action File Number*

*2003-CV-69140*, was filed in the Superior Court of Fulton County, State of Georgia (the "**Vasquez Complaint**").

92.

That the Vasquez Complaint asserted:

### The Post Board Replaces John A. Williams as CEO and Chairman of the Board

A.

That Defendant Williams founded Post nearly 32 years ago.

B.

That in March, 2002, Post announced a plan of succession. The succession plan called for Defendant Stockert to replace Defendant Williams as CEO of Post as of July, 2002, but also provided that Defendant Williams would remain as Post's Chairman of the Board until 2013.

C.

That although Defendant Stockert took over as CEO of Post in July, 2002, Defendant Williams was not yet willing to give up control over Post.

D.

That as a result, the Post Board was determined to force Defendant Williams out as Chairman of the Board of Post, and began taking steps in that direction.

E.

That on February 21, 2003, Post announced that Defendant Williams was being replaced as Chairman of the Board of Post by Defendant Goddard. Defendant Williams became Chairman Emeritus and remained a member of the Board.

### F.

That at or around the same time, Defendant Glover stepped down as Vice Chairman of Post's Board of Directors, a position he had held for more than three (3) years. Defendant Glover remained a member of the Board.

### G.

That also on February 21, 2003, Post announced that it would take charges of between $12 million and $14 million related to payments and benefits provided to Defendant Williams and Defendant Glover.

### H.

That despite these enormous benefits, Defendant Williams still wanted to control and direct Post's business and affairs. During the six (6) month period from September, 2002 through March, 2003, Defendant Williams: (1) secretly tried to negotiate a management buyout of Post; (2) has been accused of inappropriate contacts with Post employees; and (3) has sued Post to prevent it from firing him.

**Post's Board Out of Hand Rejects Cash Offer to Purchase the Company**

### I.

That on February 19, 2003, Defendants received a *bona fide* letter of interest from a "reputable" real estate investment firm interested in acquiring Post. Rather than enter into discussions with the potential acquirer, convening an independent Board committee to do so, or presenting the potential offer to the shareholders, Defendants determined to ignore the *bona fide* letter of interest and, in so doing, disregarded their fiduciary obligations to Post shareholders, including Plaintiff.

### J.

That on March 14, 2003, a "reputable" real estate investment firm approached Post's Board and offered to purchase the Company for $26 per share cash, with no financing contingencies (the "march 14 Buyout Offer"). The March 14 Buyout Offer came from the same real estate investment firm that had sent Defendants the *bona fide* letter described in the preceding paragraph.

### K.

That the March 14 Buyout Offer represented a 13 percent (13%) premium over the closing price of Post stock on that day. Moreover, the real estate investment firm that made the March 14, 2003 Buyout Offer also indicated to Post's Board that it might increase its March 14 Buyout Offer after conducting due diligence.

### L.

That regardless, Defendants rejected the March 14 Buyout Offer without investigating it, without forming an independent Board committee to evaluate it, without retaining an investment bank to evaluate it, and without presenting it to Post shareholders for their consideration. In fact, Defendants failed to disclose the identity of the "reputable" real estate investment firm until April 29, 2003, when Defendants finally revealed the potential acquirer to have been General Investment & Development Company of Boston.

**Post Receives a Temporary Restraining Order Prohibiting its Board from Voting to Restrict Defendant Williams' Involvement at Post**

-49-

M.

That on March 24, 2003, Post was the subject of a temporary restraining order (the "TRO") in the lawsuit that Defendant Williams brought against it. The TRO prohibited Post and its Board from engaging in any action involving Defendant Williams for a period of thirty (30) days and enjoined Post's Board from voting on numerous resolutions to restrict Defendant Williams with respect to Company matters, including restrictions on access to employees and information.

## Defendant Williams Takes Steps to Change the Composition of Post's Board

N.

That in connection with Post's annual Meeting, Defendants issued a proxy statement to Post shareholders on April 4, 2003. In the proxy statement, Defendants unanimously recommended that Post shareholders re-elect Defendants Teague, Stockert, Bloom, French, Goddard and de Waal, which were the only Board members whose terms were expiring, to Post's Board of Directors.

O.

That on April 7, 2003, Defendant Williams, who has represented himself to be Post's largest shareholder, announced that he plans to nominate a slate of directors to replace a majority of the current Post Board. Along with the proposed new slate of directors, Defendant Williams proposed that he be reinstated as CEO of Post.

P.

That Defendant Williams' announcement marked the beginning of acrimonious proxy fight led by Defendant Williams in opposition to a competing proposal from Post's current Board (the "Proxy Contest").

Q.

That the results of the Proxy Content will not be known until Post holds its annual meeting, which currently is set for May 22, 2003.

R.

That on the same day that he announced the Proxy Contest, Defendant Williams stated that he was withdrawing his pending lawsuit against the Company to ensure that his personal interests remain aligned with the interests of all Post shareholders.

S.

That in the months leading up to the Proxy Contest, Defendant Williams had contemplated initiating a leverage buyout of Post, or some other form of transaction by which he could purchase all of the Company's outstanding shares. Thus, if the Proxy Contest ultimately is won by Defendant Williams and his proposed new Board of Directors, market analysts have stated that the victory would signal to investors that Post was for sale.

T.

That Defendant Williams' proposed new slate of director includes: (1) George Puskar, former Chairman and CEO of Equitable Real Estate Investment Management; (2) Former Georgia Governor Roy Barnes; (3) Paul Dolinoy, former president of Lend Lease Real Estate Investments; (4) Thomas Lavin, an independent real estate adviser and former real estate investment banker; and (5) Jansen Noyes, III, former Vice President of Emigrant Savings Bank.

U.

That together, Defendant Williams and his five nominees would constitute a majority of Post's Board, if elected. The new Board intends to install Defendant Williams as CEO, replacing Defendant Stockert, who had replaced Defendant Williams on February 21, 2003.

V.

That moreover, Defendant Williams has stated if he is successful in the Proxy Contest, the new Board of Directors will take steps to enhance shareholder value. Defendant Williams has acknowledged that these steps could include selling the Company, or some other form of business combination.

W.

That later in the day on April 7, 2003, Post announced that it intended to oppose Defendant Williams' efforts to change the composition of the Board.

X.

That on April 8, 2003, *Moody's Investors Service* and *Standard & Poor's* credit rating services both warned that they are, and have been, monitoring the Proxy Contest and other affairs at Post, and may have to cut their debt ratings on the Company.

**Post Directors and Officers are Fired and/or**

**Resign Under Mysterious Circumstances**

Y.

That on April 4, 2003, Post announced that Defendant Blank intended to resign his membership on the Post Board effective May 22, 2003.

-52-

## Z.

That just days later, on April 9, 2003, Post announced that it had fired its Chief Financial Officer (the "CFO"), Gregory Fox ("Fox"), and an executive vice president, Douglas Gray ("Gray"). The Board has not disclosed the facts and circumstances surrounding the abrupt termination of these two high-level executives and, indeed, did not give any reason for their departures from the Company.

## AA.

That in fact, the Post Board did not disclose the terminations of Fox and Gray until almost a week had passed, and only after Defendant Williams confirmed the terminations of Fox and Gray to the *Atlanta Journal-Constitution*. The terminations of Fox and Gray are a material event, particularly in light of the Proxy Contest and the other monumental managerial changes occurring at Post, and, as such, Post's Board should have disclosed these firings and the surrounding circumstances to Post shareholders immediately. It failed to do so.

## BB.

That under his employment agreement, Fox is due a lump-sum cash payout equal to three times his salary within 30 days from the date of his termination. In 2002, Fox had a salary of $315,000.00. Thus, Post is due to make a payout to Fox of nearly $1 million in connection with his termination. Fox may be entitled to additional renumeration and benefits, and, according to Defendant Williams, Fox is entitled to a package valuing approximately $1.7 million.

## CC.

That on April 9, 2003, Defendant Williams filed a statement with the Securities and Exchange Commission (the "SEC"), demanding to know why Fox and Gray were fired, and why Post waited almost one week to disclose this information to Post shareholders and to Wall Street.

## DD.

That Defendant Williams has also publicly questioned the propriety of allowing Fox and Gray to continue their employment at Post until their successors are found.

## EE.

That on April 16, 2003, the current Post Board issued a statement regarding its position on the Proxy Contest. In large part, the statement bashed Defendant Williams' abilities and qualifications to run Post and criticized his track record.

## FF.

That moreover, Post's April 16, 2003 announcement accused Defendant Williams of having a conflict of interest with Post's shareholders.

**More Public Revelations of the Post Board's Breaches of Their**

**<u>Fiduciary Duties to Post Shareholders</u>**

## GG.

That in an SEC filing on April 21, 2003, Defendant Williams disclosed that Post's current Board had ignored and declined even to hold talks with the potential suitor that made the March 14 Buyout Offer.

## HH.

That indeed, Defendant Williams has asserted that Post's limited disclosure of the March 14 Buyout Offer omitted several material details that would be significant to Post shareholders, including that the March 14 Buyout Offer contained no financing contingencies and represented a 13 percent (13%) premium to the closing stock price of Post stock on March 14, 2003, the day the offer was made. Nonetheless, Post never disclosed this to its shareholders.

## II.

That the April 21, 2003 SEC filing also notes that Defendant Williams had considered making his own buyout offer of the Company in the fall of 2002.

## JJ.

That according to Defendant Williams, Post's reluctance to disclose all of the material facts and circumstances surrounding the March 14 Buyout Offer demonstrated "its unwillingness to take actions that will enhance value for all Post Properties shareholders".

## KK.

That Post's Board responded that Defendant Williams only wanted the Board to consider the March 14 Buyout Offer because it included special tax-deferred arrangements that would benefit Defendant Williams personally.

## LL.

That according to Post, Defendant Williams appears "unable to distinguish between his own needs and those of the Company and its shareholders".

### MM.

That on April 22, 2003, Defendant Williams announced that an investigation should be conducted to find out why Post fired Fox and Gray, and why Post delayed the news of their firing.

### NN.

That according to the April 22 announcement, "Management's actions have prevented directors from exercising their fiduciary duties to act in the best interest of Post shareholders... These two incidents are just further examples of why we believe shareholders should elect independent directors who will implement shareholder-friendly corporate governance...".

### OO.

That Defendant Williams has demanded that Post reveal the amount of the severance packages offered to Fox and Gray.

### Post Announced Self-Styled Measures to "Further Empower Shareholders"

### PP.

That on April 28, 2003, Post announced three major initiatives that, according to Post, "further empower shareholders". It announced that it will ask its shareholders to vote in favor of the elimination of its existing classified Board structure at the 2004 annual meeting. It announced that it will not adopt a shareholder rights plan, commonly called a "poison pill", without approval of the shareholders unless the "poison pill" contained a "sunset provision" requiring that it expire in nine months. It announced that it will not opt into the Georgia Anti-Takeover Law that restricts mergers and other business combinations. These belated efforts fail to remedy Defendants' earlier breaches

-56-

in connection with the March 14 Buyout Offer and in connection with Post's many selective disclosures as described above.

QQ.

That same day, Defendant Williams commented on what he called "Post Properties Sudden, 180-Degree Reversal and Adoption of Independent Platform's Corporate Governance Initiatives". According to Williams, Post's adoption of corporate governance initiatives as described in the preceding paragraph merely echoed some of the shareholder-friendly corporate governance provisions proposed by Defendant Williams and his "independent director nominees".

RR.

That Defendant Williams further stated that

> At a recent special meeting of the Board of Directors in January, 2003 called specifically for that purpose, Post's management, acting together with its lawyers and financial advisors, recommended proposals to opt into Georgia's draconian anti-takeover statutes, and to approve additional by-law amendments having serious anti-takeover implications. The Board only agreed to table these proposals as a result of my strenuous objections to such measures.

> Clearly, Post only made this total reversal following our pressure and demands from shareholders. This Board has an unenviable track record of failing to put shareholders first – such as when the company only belatedly disclosed: the bona fide, fully-financed third party acquisition proposal at a significant premium to its then-market price. and its refusal to explore the proposal; or the announcement of Fox and Gray's termination, at least five days after the executives were told they were "being let go".

SS.

That George Puskar, one of Defendant Williams' director nominees and his proposed non-executive Chairman stated:

-57-

The sudden adoption of these initiatives does not remedy the serious lack of disclosure to shareholders on a number of important issues that we highlighted this morning. It will also not result in the company beginning to explore discussions with the potential buyer, or appointing a Special Committee of independent directors to objectively evaluate all strategic alternatives – other important proposals in our platform. Only as shareholders are beginning to vote is the company starting to be more responsive to shareholders' interests. But I believe they will not be able to change their spots.

### Post Urges Its Shareholders to Reject Defendant Williams' Proxy Materials and to Vote in Favor of the Current Board

TT.

That on April 28, 2003, Post mailed a letter to its shareholders urging them to "support your Board's efforts to build value for all shareholders and reject Mr. Williams' effort to re-take control of your Company..."

UU.

That according to Post, Defendant Williams has made repeated misstatements and omissions in his proxy materials to shareholders, including the following:

a.    Defendant Williams does not own 2.9 million Post shares and is not the Company's largest shareholder;

b.    Defendant Williams faces unique tax considerations that are not shared by holders of Post common stock; and

c.    Defendant Williams is trying to control Post so that he can control his "tax destiny".

**Defendant Williams Poses Questions to Post's Board of Directors**

VV.

That on April 29, 2003, Defendant Williams issued another press release, in which he announced the launching of a dedicated "What's New" section on Post Properties shareholder website, www.postshareholders.com. Defendant Williams posed the following questions to the Post Board on that website:

a.    Why don't you have a fiduciary duty to explore bona fide acquisition proposals like the $26 proposal received on March 14, 2003?

b.    Can you explain your financial analysis justifying your rejection of their offer, and your refusal to take them up on their willingness to explore paying potentially more?

c.    Given your refusal to explore this proposal, what is your plan for restoring operating performance to levels that will result in a share price reflecting a meaningful premium to the $26.00 per share offer? How long should shareholders wait for this restoration of value?

d.    What revenue management programs will you put in place to stem the tide of declining same store revenue, which remains the worst amongst a peer group of 16 major publicly traded apartment companies?

e.    How would you respond to the questions raised by independent analysts and investors who are concerned that they believe Post's stock price will decline if the independent slate is not elected? Will it go back to $22.95, the closing price of Post shares on March 14, 2003, the day the company received the bona fide acquisition proposal?

f.    Why haven't we heard about the compensation package being negotiated for Bob Goddard? Are you afraid to share that information with shareholders before the annual meeting?

g.    What qualified Goddard for his leadership position – he has never held a position of leadership in a public company, let alone a major publicly traded apartment REIT – shareholders have a right to know this material information before the vote?

h.    . Will you confirm or deny that employees feel some executives are using intimidation tactics that they will be fired or will lose their jobs if they vote in favor of the independent slate proposed by John Williams? Will you confirm that employees will not face any reprisals based on how they vote, and that their votes of their 401K plan shares will be kept confidential as required by law?

i.    Why have you refused to give any explanation for the firings of Greg fox, Chief Financial Officer and his direct report, Doug Gray, Executive Vice President, responsible for asset acquisitions and dispositions, two of the top six senior executives of the company? If their performance was so unsatisfactory, why were their severance packages so rich? Are they required, as part of their sweetheart payments, not to discuss the circumstances of their termination?

j.    How can you justify paying Fox, a fired employee, a severance package of approximately $1.7 million, and Gray, another fired employee, over $1 million in a severance package, according to our estimates based on the company's public disclosure? Is this also fair to associates of Post, who have been forced to take a 2 1/2 percent cap on salary increases?

-60-

k.    Do you think that conducting over $200 million in asset sales through just one broker, with whom the company has no formal engagement documentation, and no incentive or penalty clauses, demonstrates the company has no proper oversight over the sale process? Why didn't the Board know about this?

l.    Is it true, as we have heard, that John Mears, EVP of Development and another of the top six executives of the company, is leaving the company? If so, why? If he, too, is gone, that will make 50% of the top management leaving without proper explanation to shareholders. What are you hiding from Post shareholders?

## WW.

That the Vasquez Plaintiffs concluded that Post Shareholders are the True Victims of the Infighting Between Post's then Board and Mr. Williams, seeking relief consistent, in part, with the current Shareholder Proposal of Williams for May 27, 2004.

## XX.

That accordingly, as it presently stands, the Vasquez Plaintiffs asserted Post shareholders were suffering as a result of the following:

m.    Defendant's failure to disclose timely the reasons for Fox's termination;

n.    The resulting liability by Post for severance payments and other benefits due to Fox upon his termination;

o.    The loss of Post's Executive Vice President, Douglas Gray, one of the top six executives of Post;

p.    Defendant's failure to disclose timely the reasons for Gray's termination;

q.    The resulting liability by Post for severance payments and other benefits due to Gray upon his termination;

r.     The Board's failure to disclose to Post shareholders that it had recommended proposals at a January, 2003 special meeting to opt into Georgia's anti-takeover statutes and to approve additional by-law amendments with anti-takeover implications;

s.     The Board's failure to explain to Post shareholders the reasons that it determined not to opt into the anti-takeover statutes and not to approve such amendments at that time and Defendant Williams' role in that decision;

t.     Defendant Williams' failure to reveal his true ownership position in Post securities entitled to vote at the upcoming Annual Meeting;

u.     Defendant Williams' failure to disclose all possible tax consequences to him that could result from an acquisition of a majority of Post's voting securities or from the March 14 Buyout Offer;

v.     The Board's failure to disclose the terms of Bob Goddard's employment and compensation;

w.     The Board's failure to disclose Bob Goddard's qualifications;

x.     The Board's attempts to create an upper management team for Post that is current-Board friendly, potentially at the expense of the Company's financial performance and at the expense of shareholders; and

y.     Defendants' failure to disclose all possible conflicts of interest that they may have.

93.

That now the 2004 Proxy Contest continues, and every day the competing groups of Defendants reveal more troublesome information that confuses and injures Post shareholders, including Plaintiff.

## COUNT I

## BREACH OF FIDUCIARY DUTY AS TO
## LEASING OF APARTMENT PROPERTIES

### 94.

That the Plaintiff hereby restates, re-alleges and incorporates herein by reference, the averments contained with in Paragraphs A through C, inclusive of the "Introduction" section, *supra*, Paragraphs A through Z, inclusive of the "Background" section, *supra*, Paragraphs 1 through 23, inclusive of the "Parties, Jurisdiction and Venue" section, *supra*, and Paragraphs 24 through 93 inclusive of the "Facts" section, *supra*, of this Complaint as if fully set forth hereinafter.

### 95.

That jurisdiction for a claim for damages for breach of fiduciary duty, under Georgia law, rests, *inter alia*, in the Superior Court.

### 96.

That the Defendants, upon information, have been undertaking, as part of a joint conspiracy, the torts complained of in this Complaint, thereby causing the actions and omissions of each to be attributable to the others.

### 97.

That the intentional leasing of various of the residences owned by Post, by Defendants knowingly undermining the value of the various Stores, through (A) improvidently discounted leases to new residents who (1) do not have the economic ability (where with all), to completely fulfill the terms, conditions, undertakings, covenants, duties and obligations of the lease agreements with Post and (2) do not emulate the level of respect attributable to historic "norm" for Post, resulting in (B) (1) an

-63-

increase in the requisite future "restoration" of the applicable residences and (2) an increase in the level of "crime" within various of the Apartment Properties (the "**Defendants' Leasing Breaches**").

98.

That the Defendants' Leasing Breaches have resulted in an increase in the costs to restore the applicable adversely impacted residences (the "**Restoration Damages**").

99.

That the Defendants' Leasing Breaches have resulted in a limitation on the ability of Post to re-lease the applicable residences adversely impacted by such, by, among other things, (A) increased costs to terminate the holding of the affected residences by the residents (the "**Increased Termination Costs**"); (B) physical and revenue (loss) damages to various of the affected residences in excess of Security Deposits (the "**Increased Damage Loss**"); (C) significant costs to rehabilitate the good will and reputation of Post as an Apartment Community of high standards for all residents who historically qualify for being such (the "**Good Will Leasing Loss**").

100.

That as a direct and proximate result of the Defendants' Fiduciary Breaches attributable to Defendants' Leasing Breaches, including the Restoration Damages, the Increased Termination Costs, the Increased Damage Loss and the Good Will Leasing Loss, manifestly evidenced by the breach of the trust of, *inter alia*, the Plaintiff and all Shareholders in the Company as their interests appear (the "Plaintiffs Group"), the Plaintiffs Group has suffered losses and damages, and therefore Defendants are liable to the Plaintiffs Group in an amount, plus interest thereon, from the date of injury, plus

consequential damages, to be determined by this Court.

101.

That Defendants' bad faith, willful misconduct, and want of care as to confirm Defendants' conscious indifference to the consequences of their actions in the inexcusable conduct and behavior set forth herein, in breaching their fiduciary duty through the Defendants Leasing Breaches, entitles the Plaintiffs Group to an award of punitive damages in an amount to be determined by this Court.

102.

**WHEREFORE**, Leventhal prays under Count One (I) of this Complaint that:

(A)     This Court enter a judgment in favor of the Plaintiffs Group and against Defendants, and each of them, for damages in an amount, plus interest thereon, from the date of injury as to the Defendants Fiduciary Breaches, in connection with Defendants Leasing Breaches together with consequential damages, in an amount to be determined by this Court;

(B)     This Court enter a judgment in favor of the Plaintiffs Group and against Defendants, and each of them, for punitive damages in an amount to be determined by this Court;

(C)     This Court award Plaintiffs Group their costs and expenses of bringing this Complaint, including but not limited to, attorneys' fees, to the extent counsel appears for the Class, Plaintiff, or otherwise, including, *inter alia*, pursuant to O.C.G.A. § 9-15-14, et seq.; and

(D)     This Court grant Plaintiff such other and further relief as it deems proper and just.

## COUNT II

## BREACH OF FIDUCIARY DUTY AS TO
## MAINTENANCE OF APARTMENT PROPERTIES

### 103.

That the Plaintiff hereby restates, re-alleges and incorporates herein by reference,

the averments contained with in Paragraphs A through C, inclusive of the "Introduction"

section, *supra*, Paragraphs A through Z, inclusive of the "Background" section, *supra*,

Paragraphs 1 through 23, inclusive of the "Parties, Jurisdiction and Venue" section,

*supra*, Paragraphs 24 through 93 inclusive of the "Facts" section, *supra*, and Paragraphs

94 through 102, inclusive of the "Count I: Breach of Fiduciary Duty as to Leasing of

Apartment Properties" section, *supra*, of this Complaint as if fully set forth hereinafter.

### 104.

That jurisdiction for a claim for damages for breach of fiduciary duty, under Georgia

law, rests, *inter alia*, in the Superior Court.

### 105.

That, upon belief, the intentional reduction of maintenance of various of the

residences and Apartment Properties owned by Post, by Defendants knowingly

undermining the value of the various Stores, has occurred through Defendants (A)

improvidently reducing necessary maintenance (i) by not maintaining the exteriors,

landscaping, roadways and parking lots, (ii) by not replacing appliances as needed (iii) by

not repairing water infiltration as needed (the "**Defendants' Maintenance Breaches**").

106.

That the Defendants' Maintenance Breaches have resulted in a diminuation in the market and other value of various of the Apartment Properties (the "**Maintenance Damages**").

107.

That the Defendants' Maintenance Breaches have resulted in a limitation on the ability of Post to efficiently sell the applicable Apartment Properties impacted by such, and to obtain the same sale price as would otherwise be obtained, but for such Maintenance Damages (the "**Maintenance Loss**").

108.

That as a direct and proximate result of the Defendants' Fiduciary Breaches attributable to Defendants' Maintenance Breaches, including the Maintenance Damages and Maintenance Loss, the Plaintiffs Group has suffered losses and damages, and therefore Defendants, and each of them, are liable to the Plaintiffs Group in an amount, plus interest thereon, from the date of injury, plus consequential damages, to be determined by this Court.

109.

That Defendants' bad faith, willful misconduct, and want of care as to confirm Defendants' conscious indifference to the consequences of their actions in the inexcusable conduct and behavior set forth herein, in breaching their fiduciary duty through the Defendants' Maintenance Breaches, entitles the Plaintiffs Group to an award of punitive damages in an amount to be determined by this Court.

110.

**WHEREFORE**, Leventhal prays under Count Two (II) of this Complaint that:

(A)  This Court enter a judgment in favor of the Plaintiffs Group and against Defendants, and each of them, for damages in an amount, plus interest thereon, from the date of injury as to the Defendants Fiduciary Breaches, in connection with Defendants Maintenance Breaches together with consequential damages, in an amount to be determined by this Court;

(B)  This Court enter a judgment in favor of the Plaintiffs Group and against Defendants, and each of them, for punitive damages in an amount to be determined by this Court;

(C)  This Court award Plaintiffs Group their costs and expenses of bringing this Complaint, including but not limited to, attorneys' fees, to the extent counsel appears for the Class, Plaintiff, or otherwise, including, *inter alia*, pursuant to O.C.G.A. § 9-15-14, et seq.; and

(D)  This Court grant Plaintiff such other and further relief as it deems proper and just.

## COUNT III

## BREACH OF FIDUCIARY DUTY AS TO DEVALUATION OF ASSETS – WASTE

111.

That the Plaintiff hereby restates, re-alleges and incorporates herein by reference, the averments contained with in Paragraphs A through C, inclusive of the "Introduction" section, *supra*, Paragraphs A through Z, inclusive of the "Background" section, *supra*, Paragraphs 1 through 23, inclusive of the "Parties, Jurisdiction and Venue" section,

-68-

*supra*, Paragraphs 24 through 93 inclusive of the "Facts" section, *supra*, Paragraphs 94 through 102, inclusive of the "Count I: Breach of Fiduciary Duty as to Apartment Properties" section, *supra*, and Paragraphs 103 through 110, inclusive of the "Count II: Breach of Fiduciary Duty as to Maintenance of Apartment Properties" section, *supra*, of this Complaint as if fully set forth hereinafter.

112.

That jurisdiction for a claim for damages for breach of fiduciary duty, under Georgia law, rests, *inter alia*, in the Superior Court.

113.

That, upon belief, the intentional Defendants' Leasing Breaches and Maintenance Breaches have caused a diminuation in the value (market or otherwise) of various Apartment Properties, in an amount not less than Twenty-Five Million Dollars ($25,000,000.00) (the "**Defendants' Valuation Breaches**").

114.

That the Defendants' Valuation Breaches have resulted in a limitation on the ability of Post to market and sell certain of the assets (Apartment Properties of Post, at least within the timeframe from within which they were to sell and for the amounts they were to sell (the "**Defendants' Valuation Damages**").

115.

That the Defendants' Valuation Damages have been, upon belief, caused by Defendants' Leasing Breaches or Defendants Maintenance Breaches, or both, as may be applicable to various Apartment Properties of Post.

116.

That as a direct and proximate result of the Defendants' Valuation Breaches, upon information, attributable to Defendants' Leasing Breaches and Defendants' Maintenance Breaches, the Plaintiffs' Group has suffered losses and damages, and therefore Defendants and each of them, are liable to Plaintiffs Group in an amount, plus interest thereon, from the date of injury, plus consequential damages, to be determined by this Court.

117.

That Defendants' bad faith, willful misconduct and want of care as to confirm Defendants' conscious indifference to the consequences of their actions in the inexcusable conduct and behavior set forth herein, in breaching their fiduciary duty through the Defendants Valuation Breaches, entitles the Plaintiffs Group, to an award of punitive damages in an amount to be determined by this Court.

118.

**WHEREFORE**, Leventhal prays under Count Three (III) of this Complaint that:

(A)    This Court enter a judgment in favor of the Plaintiffs Group and against Defendants, and each of them, for damages in an amount, plus interest thereon, from the date of injury as to the Defendants Fiduciary Breaches, in connection with Defendants Valuation Breaches of, not less than Twenty-Five Million Dollars ($25,000,000.00), together with consequential damages, in an amount to be determined by this Court;

(B)    This Court enter a judgment in favor of the Plaintiffs Group and against Defendants, and each of them, for punitive damages in an amount to be

determined by this Court;

(C)    This Court award Plaintiffs' Group their costs and expenses of bringing this Complaint, including but not limited to, attorneys' fees, to the extent counsel appears for the Class, Plaintiff, or otherwise, including, *inter alia*, pursuant to O.C.G.A. § 9-15-14, et seq.; and

(D)    This Court grant Plaintiff such other and further relief as it deems proper and just.

## COUNT IV

## BREACH OF FIDUCIARY DUTY AS TO CORPORATE WASTE

119.

That the Plaintiff hereby restates, re-alleges and incorporates herein by reference, the averments contained with in Paragraphs A through C, inclusive of the "Introduction" section, *supra*, Paragraphs A through Z, inclusive of the "Background" section, *supra*, Paragraphs 1 through 23, inclusive of the "Parties, Jurisdiction and Venue" section, *supra*, Paragraphs 24 through 93 inclusive of the "Facts" section, *supra*, Paragraphs 94 through 102, inclusive of the "Count I: Breach of Fiduciary Duty as to Leasing of Apartment Properties" section, *supra*, Paragraphs 103 through 110, inclusive of the "Count II: Breach of Fiduciary Duty as to Maintenance of Apartment Properties" section, *supra*, and Paragraphs 111 through 118, inclusive of the "Count III: Breach of Fiduciary Duty as to Devaluation of Assets – Waste" section, *supra*, of this Complaint as if fully set forth hereinafter.

-71-